UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS – FORT WORTH DIVISION

| | |
|---|---|
| Daniel Carey, Robert Held, and Lloyd Hill, ) <br> ) <br> Plaintiffs, ) <br> v. ) <br> ) <br> Allied Pilots Association, ) <br> ) <br> Defendant. ) <br> ) | 4-03CV-277-Y |

**BRIEF IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

Introduction

Plaintiffs are members of the Allied Pilots Association ("APA") who are seeking for themselves and other members the right to a fair and democratic referendum under the APA Policy Manual, Sections 9.06 and 9.07, the APA Constitution and Bylaws ("C&B"), Article XIII, and the Labor Management Relations and Disclosure Act, 29 U.S.C. § 401, et seq ("LMRDA"), the result of which will determine whether the membership of APA will accept or reject a new collective bargaining agreement (the "tentative agreement") between APA and AMR corporation ("AMR."). On March 31, 2003, APA initiated the referendum by mailing ballots to the membership that would allow them to vote via phone or the internet with a deadline of April 14, 2003, the results to be announced by 4:00 PM Central time on April 15, 2003 unless injunctive relief is granted.

For the reasons that follow, the plaintiffs will show that the referendum is unlawful and that, unless enjoined, their rights will suffer irreparable harm. Essentially, the plaintiffs and other members of APA are being asked to vote on a tentative agreement that is far from finalized, to the point that contractual language is not available and the practical implications of the tentative agreement are not clear to the APA membership or the APA leadership. The plaintiffs and the

1

membership are in this untenable situation due to hasty and unlawful decisions by the APA Board of Directors to abrogate the Policy manual, violate the C&B, and conduct a referendum on the ratification of a contract that is both unavailable for study by the membership and still under negotiation by both parties.

## Statement of Facts[1]

The Allied Pilots Association was formed in 1963 after the pilots of American Airlines, Inc. ("AMR") decertified the Airline Pilots Association ("ALPA") as their bargaining agent under the Railway Labor Act ("RLA"). During the period 1963-1991, new collective bargaining agreements were ratified by the APA Board of Directors ("BOD"). In 1991, the APA BOD passed an amendment to the Constitution and Bylaws ("C&B") that required the membership to ratify any permanent changes to the C&B. Trommer Aff. Par. 3.

In 1997, the pilots of American Airlines voted to approve a new collective bargaining agreement. The process that surrounded this vote disturbed the members of the APA to such an extent that the BOD modified Sections 9.06 and 9.07 of the APA policy manual to ensure that both BOD and member ratification of future tentative agreements would involve sufficient due diligence and an adequate time frame for all parties to cast an informed vote, including a thorough knowledge of the implications of the tentative agreement and the language contained therein. Hunnibell Aff. Par. 3, Trommer Aff. Par. 3, Mayer Aff. Par. 3

In July 2001, the pilots of APA delivered contract openers to AMR with the intention of negotiating a new collective bargaining agreement under the RLA. On or about March 26, 2003, the APA BOD voted to abrogate the policy manual, specifically as to the BOD and member

---

[1] This Memorandum incorporates by reference the facts as set forth in the Affidavits of Plaintiffs Held and Carey, and APA Members Goldberg, Hunnibell, Schafer, and Trommer, and their respective attachements, if any. All of these Affidavits are contained in the Appendix to this filing.

2

ratification timeline specified in the Policy Manual 9.07. The APA announced a "streamlined" process due to an artificial deadline for ratification of April 15, 2003. On March 31, 2002, the APA BOD ratified an agreement in principle which then became a tentative agreement. The APA Board has a responsibility to review an agreement in principle prior to voting to ratify that agreement. APA C&B Title XIII Sect. E. The APA Board did not satisfy this requirement and in fact did not possess the contractual language or even a conceptual idea of what much of the agreement in principle entailed. Mayer Aff Par. 4

The APA BOD distributed ballots to the membership via U.S. mail. The ability to vote was immediate upon receipt and could be accomplished via telephone or the internet. Goldberg Aff. Par. 4.

At this time, the contractual language of the tentative agreement was unavailable in any form obtainable by the membership. Goldberg Aff. Par, 4, Hunnibell Aff. Par. 7. Subsequently, the agreement was posted on the APA website, but the substance of the agreement changed on a daily basis. Summaries and contractual language mailed by APA to individual members differed substantially from the information provided on the APA website, causing further confusion amongst the membership, and greater uncertainty as to what provisions the tentative agreement actually contained. Goldberg Aff Par. 4, Hunnibell Aff. Pars. 8-10, Trommer Aff. Par. 4

APA proceeded to conduct "road shows," traveling presentations made at all pilot domiciles designed to educate the membership on the content of the tentative agreement. During these "road shows," APA officials expressed confusion as to the actual content of the tentative agreement and freely admitted that they had violated the APA C&B and the Policy manual during the ratification process. Goldberg Aff. Par.5, Hunnibell Aff. Par.17. During these "road shows," questions arose as to the discrepancy between the various versions and changes made to

the contract language on the APA website and in the printed materials sent to the APA membership. These questions went substantially unanswered. Hunnibell Aff. Pars. 11-15.

Of particular concern to many members is the presence of a "contingency agreement" that would render the APA Tentative Agreement null and void even if ratified if other labor groups at AMR failed to ratify their tentative agreements. The absence of a contingency agreement could cause undue harm to the membership of the APA, particularly in the case of an eventual bankruptcy filing by AMR. Information on the presence of a contingency agreement within the tentative agreement has been unavailable to members that have sought clarification on this subject. Goldberg Aff. Par. 5

Incredibly, even as of today, there is no contractual language in a "final" version of the tentative agreement available to the APA membership or to members of the APA Board of Directors. Mayer Aff Par 6, Trommer Aff Par. 4, Hunnibell Aff. Par. 18, Goldberg Aff. Par. 6. Meanwhile, the vote continues, the deadline approaches, and APA members are forced to make a decision on the tentative agreement with no certainty as to the status of key language and provisions in the agreement, and with little time to make their decision if such language was to be clarified by the APA.

The haste with which the agreement in principle was ratified by the APA Board of Directors, and the accelerated timetable for membership voting, are not in the best interests of the plaintiffs or the APA membership. The situation has only been compounded by the absence of a final, written agreement and a dearth of information on portions of the tentative agreement, and multiplied again by the dissemination of various "versions" of contractual language and summary that only serve to confuse the membership and make it impossible to cast an informed vote. Goldberg Aff. Par. 6-7, Hunnibell Aff. 19-20.

Perhaps of even greater importance, elements of the tentative agreement are still being negotiated even as APA members vote. Mayer Aff. Par. 5. The history of past contract negotiations between APA and AMR are rife with disturbing examples of last-minute alterations of contractual language and subterfuge. Trommer Aff. Par. 3. Past history dictates that APA should be particularly diligent in outlining precise contractual language prior to submitting the agreement in principle to the Board of Directors and then on to the membership for ratification. Ratification of what is clearly an incomplete agreement cannot be in the best interests of the plaintiffs, or the APA membership as a whole. Mayer Aff. Pars.9-11.

## ARGUMENT

**I. PLAINTIFFS HAVE BEEN DEPRIVED OF THEIR RIGHT TO AN INFORMED, MEANINGFUL AND DEMOCRATIC RATIFICATION.**

Congress enacted the LMRDA in order to guarantee "the full and active participation by the rank and file in the affairs of the union." American Federation of Musicians v. Wittstein, 379 U.S. 171, 182-83 (1964). The primary means Congress selected for promoting this objective was "through processes of democratic self-government." Wirtz v. Hotel, Motel Employees, 391 U.S. 492, 497 (1968).

Congress recognized that a cornerstone of any democracy was information. It determined that constituents needed to be "armed with adequate information" because only with "detailed essential information about the union [would] the individual members [be] fully competent to regulate union affairs." S. Rep. No. 187, 86th Cong., 1st Sess., pp. 7, 9 (1959); I (NLRB) Legis. Hist. of LMRDA at 403, 405.[2] Thus, Congress modeled LMRDA's Title I "Bill

---

[2] Over the years, courts have uniformly recognized that the LMRDA generally, and Title I in particular, must be construed broadly to promote Congress' remedial objectives. See, e.g., McGinnis v. Teamsters Local 710, 774 F.2d 196, 199 (7th Cir. 1985); Mallick v. IBEW, 749 F.2d 771, 786 (D.C. Cir. 1984); Knox County Local v. Rural

5

of Rights" after the U.S. Constitution's Bill of Rights. <u>United Steelworkers of America v. Sadlowski</u>, 457 U.S. 102, 111 (1982).

Many Title I courts have read the right of free speech and the right to participate in union affairs in tandem in order to achieve Congress' objectives.[3] In one seminal case, the court found that union officers have a fiduciary duty "to see that the lines of communication and dissemination of views and opinions are kept open and working, especially as to matters on which members will be asked to vote." <u>Blanchard v. Johnson</u>, 388 F. Supp. 208, 214 (N.D.Ohio 1975), <u>aff'd in relevant part</u>, 523 F.2d 1074 (6th Cir.), <u>cert. denied</u>, 429 U.S. 869 (1976). The court reasoned that

> A meaningful vote is not a deliberately uninformed vote, because as such there is no choice, no selection, but merely a shot in the dark. In the view of this Court it would be chimerical to hold that Congress guaranteed an equal right to vote on union affairs without also guaranteeing that the processes of enlightenment be kept open.

In that case, the court enjoined an ongoing union referendum to affiliate with another union because opponents had not been given "sufficient time to express their views <u>before</u> [the] vote [was] to begin." 388 F. Supp. at 215 (emphasis added). When affirming that decision, the court of appeals elaborated that "union officers may convey their opinions on the issues to the membership but are also duty-bound to see that points of view at variance with their own, if such exist, are disseminated." 523 F.2d at 1076. It is axiomatic that there must be an opportunity for opposing views to be expressed - much less disseminated.

---

Letter Carriers, 720 F.2d 936, 938-39 (6th Cir. 1984); <u>Int'l Bro. Boilermakers v. Braswell</u>, 388 F.2d 193, 200-01 (5th Cir.), <u>cert. denied</u>, 391 U.S. 935 (1968); <u>Johnson v. Nelson</u>, 325 F.2d 646, 650 (8th Cir. 1963).

[3]   Section 101(a)(1), 29 U.S.C. § 411(a)(1), provides <u>inter alia</u>: "Every member of a labor organization shall have equal rights and privileges within such organization to . . . vote in elections or referendums . . . and to participate in deliberations and voting upon the business of [the organization]."

Section 101(a)(2), 29 U.S.C. § 411(a)(2), provides <u>inter alia</u>: "Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions . . .."

In <u>Bunz v. Motion Picture Machine Operators</u>, 567 F.2d 1117 (D.C. Cir. 1977), the court reviewed a number of Title I decisions finding that members' rights were denied when, for example, they were afforded only a "naked right to cast a ballot" in the absence of adequate information, where union officials "circulated inadequate or misleading information about matters to be voted upon," and where there had been "irregularities, or foul play at any stage of the electoral process." <u>Id.</u> at 1121-22.

Similarly, in <u>Sheldon v. O'Callaghan</u>, 497 F.2d 1276, 1282 (2d Cir.), <u>cert. denied</u>, 419 U.S. 1090 (1974), the court held that "[a] fair referendum . . . include[s] the right of members whose views were opposed to defendants' to have an opportunity to present their views to other members of the union" on whether to adopt a new constitution. <u>See also</u> <u>Usery v. Int'l Organization of Masters, Mates & Pilots</u>, 538 F.2d 946, 947 (2d Cir. 1976).[4]

In <u>Bauman v. Presser</u>, 117 LRRM 2393, 2399 (D.D.C. 1984), the court reasoned that whether members

> have been deprived of their right to a "meaningful" vote depends on whether they were given adequate notice and information . . . [a]nd . . . whether [the members] had "enough time and opportunity to mount effective support or opposition to the leadership's position." In a democratic system such as the one envisioned by the LMRDA, it is axiomatic that members must have the opportunity to attempt to persuade their fellow members to reject or support a proposal which, as in the case at bar, strikes at the very heart of their quality of life, both at work and at home. (Citations omitted.)

In <u>Bauman</u>, the court impounded, and enjoined the union from counting, the ballots cast in a "quickie" contract ratification referendum initiated immediately after disseminating copies of the new contract to officers. The court found that the "plaintiffs did not have an adequate

---

[4]    To insure not only that opponents to incumbent union policy are able to exercise their right to speak, but also that their fellow union members will have the opportunity to hear opposing viewpoints on referenda issues, Title I courts have required unions to equip the opponents with the means to communicate with union memberships. <u>See</u>, e.g., <u>Knox County Local v. Nat'l Rural Letter Carriers Ass'n</u>, <u>supra</u> (granting access to union publication); <u>Lodge 1380, BRAC v. Dennis</u>, 625 F.2d 819 (9th Cir. 1980) (union must furnish mailing list); <u>Soto v. Masters, Mates & Pilots</u>, 466 F. Supp. 1294 (S.D.N.Y. 1979) (mailing list); <u>Cotter v. Helmer</u>, 692 F. Supp. 313 (S.D.N.Y. 1988) (mailing list); <u>Sheldon v. O'Callaghan</u>, <u>supra</u>; <u>Blanchard v. Johnson</u>, <u>supra</u>.

opportunity to intelligently discuss or debate the proposed agreement or to lobby their fellow members for their support," thereby depriving plaintiffs of their Title I rights. Id. at 2399. In doing so, the court rejected the union's defense that by giving members more than three weeks in which to vote, there was adequate time for discussion and debate, and for members to become informed. It did so because the "ballots were immediately mailed after the surprise announcement of the tentative agreement [and t]he members could cast their ballots as soon as they received them . . .." Id. at 2400. See also Hayes v. Master, Mates & Pilots, 670 F. Supp. 1330 (D.Md. 1987)(ordering the impoundment of ballots in referendum commenced before opponent could communicate with membership). Similarly, in the present case, although the APA members were informed that the APA Board of Directors had approved an agreement with AA, the terms of the agreement have been murky, shifting, incomplete and confusing. Moreover, the APA has sent signals indicating the terms of the agreement could be renegotiated. In fact, the APA appears to be renegotiating the purported Tentative Agreement terms as of April 11. See Mayer Affidavit. The available materials, comprised of hundreds of pages of complex contractual language, have been changed several times during the voting process. See Goldberg, Hunnibell and Trommer Affidavits.

When Plaintiffs learned that the ballots were actually mailed before the APA had reached an agreement with AA and before there could be any meaningful discussion and debate about the terms of the deal, and it became clear to Plaintiffs that there could be no meaningful discussion or debate about the terms of the deal going forward owing to the lack of a final agreement to analyze and consider, Plaintiffs sought to postpone the ending date of the voting in order to permit the process of enlightenment to begin before members began casting their ballots. See

Letter to APA President Capt. Darrah from Plaintiff Robert Held, and Held Affidavit. Defendants did not respond.

As in Bauman, the fact that APA members did not have to cast their ballots immediately after receiving them, and could instead have set the whole CBA question aside for a couple of days and still have been able to vote and have their ballots counted, does not change the fact that the APA initiated the voting process before any discussion and debate, and the process of enlightenment, could even get underway.

Legally, what is critical is the timing of the referendum process, not the content of representations made by the APA, or other opponents or proponents of the agreement — except to the extent they contain misrepresentations or fail to communicate material information. First, the APA has failed to provide the contractual language, both to the APA Board, see Mayer Affidavit, and to the membership. See Goldberg and Trommer Affidavits  What is most significant in that regard is simply that the APA initiated the voting process before the process of voter enlightenment could get off the ground.[5]

While, plaintiffs submit that Bauman provides the best guidance and precedent for the award of the relief sought here, Kleppick v. Pennsylvania Telephone Guild, 122 LRRM 3335 (W.D.Pa. 1986), is also helpful by way of comparison.  In that case, the plaintiffs sought, unsuccessfully, to derail a referendum to merge their union into another union after their union leadership had spurned a similar offer from yet a third union. Unlike the case at bar, "at least six weeks prior to the scheduled referendum vote, each member was sent and/or received a copy of the proposed affiliation agreement.  Through a series of mailings and meetings every member received pertinent information and explanations of all provisions and/or procedures." Id. at

---

[5] See also Farkas v. Rumore, 148 LRRM 2878, 2881-82 (S.D.N.Y. 1995), Carothers v. McCarthy, supra, and Hayes v. Master Mates & Pilots, 670 F. Supp. 1330, 1334-35 (D.Md. 1987), cases involving unduly expedited voting in order to prevent the development of any meaningful opposition.

3340. Plaintiffs and even the spurned union not only sent propaganda during this period, they attended the informational meetings and were allowed to address the members and "speak out against [such] affiliation." Id. Further, the leadership even sent the members a copy of the competing union proposal which they had opted to reject so the members could compare the two proposals for themselves. In these circumstances, the court found that the referendum process was fair and democratic since no information had been withheld by the union leadership which had actually facilitated a healthy political debate prior to the commencement of voting. Moreover, there was sufficient opportunity for the membership to read the proposals, compare information from the various unions and to become enlightened.

While APA President Darrah proffered no explanation for his rejection of plaintiff Held's request to delay commencement of the "quickie" ratification to permit opponents to communicate their views and arguments to the electorate after having access to a final written agreement, it is possible that the APA will contend that it was contractually bound via commitments to AA to send the ballots on March 26th. But this was five days before the APA Board of Directors even ratified the proposed Tentative Agreement.. But, given that the Tentative Agreement, if approved, will not be effective until May 1, 2003, the union could not have a compelling reason to insist on the referendum timetable other than conduct a "quickie" vote before any meaningful and informed membership opinion could develop. This conclusion is buttressed by the fact that the APA disseminated no specific information about the terms of the Tentative Agreement proposal until Tuesday, April 2nd, five business days after the ballot information was mailed. Nothing in the Tentative Agreement enjoined the APA from disseminating meaningful information weeks earlier. The bottom line is that, despite certain superficial and meaningless overtures all made during the balloting process itself, the APA did

nothing to facilitate the process of enlightenment among the APA electorate and instead has done what it can to undermine that process and deprive the APA membership of a meaningful vote in violation of their rights under Sections XIII D and E of the APA Constitution, and Section 101(a)(1) and (2) of the LMRDA.

Section 101(a)(1) protects the right of members to participate in the affairs of their unions and particularly to have voting conducted in a fair and democratic manner. See, e.g., Rota v. BRAC, 64 F.R.D. 699, 702 (N.D.Ill. 1974); McGinnis v. Teamsters Local 710, 774 F.2d 196, 201-03 (7th Cir. 1985); Aquirre v. Teamsters Local 165, 633 F.2d 168, 173 (9th Cir. 1980); Meek v. Teamsters, 681 F. Supp. 1014, 1019 (E.D.N.Y. 1988). Clearly, the ongoing ratification is marred by all sorts of irregularities which will deprive it of a fair and democratic character.

The ratification process was clearly tainted from its inception, beginning with the APA BOD vote on an agreement in principle that resulted in the tentative agreement. The APA's own Constitution and Bylaws binds the Board of Directors and requires them to "review" any agreement in principle prior to conducting a ratification vote (APA C&B Article XIII Sect. E). Clearly, the process that took the agreement from an agreement in principle to a tentative agreement failed to meet the appropriate standards, particularly in view of the past troubled history of contract ratifications and negotiations within APA. See Affidavits of Trommer and Hunnibell. Not only did the APA improperly waive the provisions of 9.07 of the Policy Manual, but they also failed to act in accordance with of 9.06 of the Policy Manual. The above provisions were not complied with prior to the BOD ratification process- and nearly two weeks later, contract language is still not available to BOD or the membership. Mayer Affidavit.

### III. PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION.

The granting of Rule 65 injunctive relief in this Circuit is governed by the four-factor, balance-of-hardship test: "(1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest." Howells v. City of New Orleans, 2001 WL 823723, *1 (E.D. La. July 20, 2001) (citing Allied Mktg. Group, Inc. v. CDL Mktg., Inc., 878 F.2d 806 (5th Cir. 1989)) (temporary restraining order); Hoover v. Morales, 164 F.3d

221, 224 (5th Cir.1998) (preliminary injunction); Sugar Busters LLC v. Brennan, 177 F.3d 258, 265 (5th Cir. 1999) (same).

> In discussing the interrelationship of these factors, one court said:
> Of all the factors, the two most important are those of probably irreparable injury to the plaintiff in an injunction is not issued and likely harm to the defendant if an injunction is issued. If, upon weighing them, the balance is struck in favor of plaintiff, a preliminary injunction should issue if, at least, grave or serious questions are presented.

North Carolina State Ports v. Dart Containerline Co., 592 F.2d 749 (4th Cir. 1979)

As for the first factor, plaintiffs respectfully submit that they have raised legal issues that are not just serious; rather, they have demonstrated more than a substantial likelihood of success on the merits of their challenge to the lawfulness of the ongoing voting process – one which will have a major impact on the membership for years to come, notwithstanding that the vote will have taken place in the absence of a written or final agreement.

Concerning harm to plaintiffs if the voting is not suspended, and the defendants enjoined from counting the ballots and announcing the results, not only will thousands of pilots and their families be severely affected, but the political landscape within the APA will be irreparably altered and the ability to conduct a second fair and democratic membership referendum will be totally undermined. Bauman v. Presser, supra, 117 LRRM at 2401; Hayes v. Masters, Mates & Pilots, supra, 670 F. Supp. at 1332-35; Gee v. Textile Processors, supra, 164 LRRM at 2057-58.

For the same reason that television networks have agreed, in the wake of recent elections, not to predict the outcome of presidential elections before the polls close on the West Coast so that voters there will be able to exercise their right to vote uninfluenced by such predictions, so also should APA members be allowed the opportunity. Defendants should conduct a second – or extended - referendum, giving the membership a meaningful opportunity to formulate and vote their preferences, following discussion and debate of the merits of the proposed Tentative

Agreement, in an enlightened atmosphere, uncontaminated by knowledge of the outcome of the first unlawful referendum that forces directors and members alike to make assumptions, without hard facts, as to whether the Tentative Agreement would turn out to prove better or worse than what could be obtained in bankruptcy, assuming bankruptcy is, in fact, the next step for AA.

Concerning potential harm to defendants if an injunction is granted, there is no reason they cannot conduct a second lawful referendum, should they choose to do so, and still consummate their Tentative Agreement, if it is approved, during April 2003. Other than having to incur the cost of conducting a second, fair and democratic referendum – or a simple extension of the first, which cost would be born by the members, i.e., the beneficiaries of the injunction, defendants will suffer no harm; arguably, since unions really are nothing more than their members, defendants would actually benefit if injunctive relief were granted.

Lastly, the public interest. Unlike those situations where union members have contested contract ratification referenda, where a crippling strike might result, or some other impact on the economy, no such factors are present here. Rather, Congress articulated the public interest when enacting the LMRDA and mandating that union members should have the right to participate in their internal union affairs and to vote in fair and democratic referenda, particularly those, like the one here, that will determine the future means, for many years to come, by which their critical workplace interests and welfare will be represented. Clearly, therefore, the public interest would be enhanced if plaintiffs' motion were granted.

There remains only the issue of an appropriate bond. In Crowley v. Teamsters Local 82, 679 F.2d 978, 999-1000 (1st Cir., 1982), rev'd on other grounds, 467 U.S. 526 (1984), the court held that the public interest would be disserved by a bond requirement that could inhibit union members from seeking injunctive relief to vindicate rights whose enforcement Congress elected

to entrust to those members. We submit that that same consideration applies with equal force here.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully submit that the Court should grant their motion for a preliminary injunction.

Respectfully submitted,

_____
David H. Bodian,
BODIAN & BODIAN, LLP
425 Broad Hollow Road
Melville, New York  11747
631-249-3900
631-249-4298 (fax)

Eugene Zemp DuBose
TBN 06151975
3303 Lee Parkway, Suite 210
Dallas, Texas 75219
214 520 2983
214 520 2985 (fax)

ATTORNEYS FOR PLAINTIFFS