ORIGINAL
(X) (NO)

FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| DANIEL CAREY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| ALLIED PILOTS ASSOCIATION, | ) | 4-03CV-277-Y |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S OPPOSITION TO
## APPLICATION FOR TEMPORARY RESTRAINING ORDER

EDGAR N. JAMES*
D.C. Bar No. 333013
James & Hoffman, P.C.
1101 17th Street, N.W., Suite 510
Washington, D.C.  20036
(202) 496-0500
(202) 496-0555 FAX

SANFORD R. DENISON
Texas Bar No. 05655560
Baab & Denison, LLP
Stemmons Place, Suite 1100
2777 N. Stemmons Freeway
Dallas, TX 75207
(214) 637-0750
(214) 637-0730 FAX

* Application for Admission Pro Hac
  Vice to be filed or currently pending

DATED: April 14, 2003

COUNSEL FOR DEFENDANT
ALLIED PILOTS ASSOCIATION


**TABLE OF CONTENTS**

I.      Statement of Facts                                                                          2

        A.  The Background and Context of the Ongoing Contract Ratification          2

        B.  The APA's Constitutional Provisions Governing this Ratification Process   3

        C.  The APA's Conduct of this Ongoing Ratification Vote                       5


II.     Applicable Legal Standards                                                    7

        A.  The Prerequisites for a Temporary Restraining Order                       7

        B.  The Law Governing APA's Internal Union Ratification Vote                  7


III.    Argument                                                                     10

        A.  Plaintiffs Fail to Demonstrate a Substantial Likelihood of Success on the   10
            Merits

        B.  Plaintiffs Fail to Demonstrate Irreparable Injury                        13

        C.  Any Threatened Injury to Plaintffs is Outweighed by the Harm Flowing From 15
            a TRO

        D.  Granting a TRO in this Case Would Disserve the Public Interest           17


IV      Conclusion                                                                   18

i

## TABLE OF AUTHORITIES

**CASES:**

Ackley v. Western Conf. of Teamsters, 958 F.2d 1463, 1473 (9th Cir. 1992) . . . . 8, 9, 10

Alexander v. Int'l Union of Operating Engrs., 624 F.2d 1235, 1240
(5th Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 9, 10, 11

Calhoon v. Harvey, 379 U.S. 134, 139 (1964) . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 11, 13

Canal Authority of Florida v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974) . . . . . . . . . 7

Chicago and North Western Ry. v United Transportation Company,
402 U.S. 570 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Christopher v. Safeway Stores, 644 F.2d 467 (5th Cir. 1981) . . . . . . . . . . . . . . . . . . . 8, 9

Clark v. Pritchard, 812 F.2d 991, 993 (5th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 7

Consolidated Restaurant Operations, Inc. v. Nat'l Processing Co., LLC,
2002 U.S. Dist. LEXIS 11795 (No. 3:02-CV-1278-G, N.D. Tex. June 28, 2002) . . . . .14

DFW Metro Line Services v. Southwestern Bell Tel Co.,
901 F.2d 1267, 1269 (5th Cir. 1990 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

Dow v. United Bhd. of Carpenters, 1 F.3d 56, 58 (1st Cir. 1993) . . . . . . . . . . . . . . . 10
Fernandez-Montes v. Allied Pilots Ass'n,
987 F.2d 278, 288-89 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

Fulk v. United Transportation Union,
81 F.3d 733, 735-36 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10, 11

Graphic Communications Local 554 (World Color Press),
306 NLRB 844, 140 LRRM 1255 (1992),
enforced, 991 F.2d 1302, 143 LRRM 2131 (7th Cir. 1993) . . . . . . . . . . . . . . . . . . 12

Hoover v. Morales, 164 F.3d 221, 224 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . 6

Hunt v. Bankers Trust Co., 646 F.Supp, 59, 63 (N.D. Tex. 1986) . . . . . . . . . . . . . . . 14

Hydrologics, Inc., 293 NLRB 1060, 131 LRRM 1350 (1989) . . . . . . . . . . . . . . . . . . .12

Local No. 243 v. United Transportation Union,
1993 U.S. Dist. LEXIS 20714, **11-12 (No. 4:90-CV-541-A, N.D. Tex. May 6, 1993),
aff'd without opinion, 18 F.3d 937 (5th Cir. 1994) . . . . . . . . . . . . . . . . . . . 8, 9, 10, 11

Medlin v. Palmer, 874 F.2d 1085, 1091 (5th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . 7

Members for a Better Union v. Bevona, 152 F.3d 58, 67 (2d Cir. 1998) . . . . . . . . . . 8, 10

Mississippi Power & Light Co. v. United Gas Pipe Line Co.,
760 F.2d 618, 621 (5th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Newell v. Int'l Bhd. of Elec. Workers, 789 F.2d 186, 1189 (5th Cir. 1986) . . . . . . . . . 9

Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville,
896 F.2d 1283, 1285 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

O'Neill v. Air Line Pilots Ass'n, 886 F.2d 1438, 1447-48 (5th Cir. 1989),
 rev'd on other grounds, 499 U.S. 65 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

Pacific Coast Metal Trades Dist. Council (Lockheed Shipbuilding Co.),
282 NLRB 239, 125 LRRM 1124 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Siegel v. LePore, 234 F.3d 1163, 1177 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . 12, 14

Sim v. New York Mailers' Union No. 6, 166 F.3d 465, 471 (2d Cir. 1999) . . . . 8, 10, 11

Spellacy v. Airline Pilots Ass'n, 156 F.3d 120, 126-27 (2d Cir. 1998) . . . . . . . . . . . . 9

Stelling v. Int'l Bhd. of Elec. Workers, Local 1547,
587 F.2d 1379, 1389 n.10 (9th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Sugar Busters LLC v. Brennan, 177 F.3d 258, 265 (5th Cir. 1999) . . . . . . . . . . . . . . . 7

Teamsters Joint Council 42 v. Int'l Bhd. of Teamsters,
82 F.3d 303, 306 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Virginia Ry. Co. v System Federation No. 40, 300 U.S. 515 (1937). . . . . . . . . . . . . . 17

Wirtz v. Glass bottle Blowers Ass'n, 389 U.S. 463, 470-71 (1968) . . . . . . . . . . . . . . . 9

**STATUTES:**

Section 101(a)(1) of the Labor Management Reporting and Disclosure Act,
29 U.S.C. § 411(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . , 8, 10

11 U.S.C. Sec.1113(c) and (e) of the Bankruptcy Code . . . . . . . . . . . . . . . . . . . . . 15, 16

29 U.S.C.  Sec. 152 (2)-(3), Sec 185 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10

**RULES:**

Fed. R. Civ. P. 65 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| DANIEL CAREY, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| ALLIED PILOTS ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S OPPOSITION TO
## APPLICATION FOR TEMPORARY RESTRAINING ORDER

The Defendant, Allied Pilots Association ("APA" or "Association"), submits this

Opposition to the Plaintiffs' application for a Temporary Restraining Order seeking to disrupt an

ongoing contract ratification vote among the pilots of American Airlines.  As explained below,

issuance of a TRO blocking the scheduled April 14 vote count in this case would deprive not

only the pilots, but all of American's employees, of a last chance to avoid a Chapter 11

bankruptcy filing by the airline.  In contrast, denial of a TRO pending litigation of this case

would cause no irreparable injury to any of the Plaintiffs, and would not jeopardize the

availability of a remedy should the Plaintiffs prevail.  In short, Plaintiffs' request for a TRO is

wholly baseless and must be denied.

## STATEMENT OF FACTS[1]

### A. The Background and Context of the Ongoing Contract Ratification

The APA is the collective bargaining representative of the approximately 12,000 pilots employed by American Airlines ("American" or "the Company"). The APA's last collective bargaining agreement with American (referred to as the "Green Book"), came open for renewal in August 2001, and the parties have been negotiating for a renewed agreement ever since that date. Concurrently, in the aftermath of the September 11, 2001 terrorist attacks and throughout the period leading up to the present war in Iraq, American and other major air carriers have suffered severe, and increasing, financial losses. Two of those major carriers, U.S. Airways and United Airlines, recently filed for bankruptcy and, in the process, obtained dramatically modified collective bargaining agreements and millions of dollars in economic concessions from the unions representing their pilots and other employees.

In February of this year, American approached the APA and the two other unions representing American's employees seeking substantial contractual concessions from all three employee groups in a last-ditch effort to avoid a Chapter 11 bankruptcy filing. The Company's deadline for reaching agreement with all three unions was Monday, March 31, with an April 14 deadline for completing ratification by each union's members. After extensive, around-the-clock negotiations against the March 31 deadline, and with American's lawyers poised to file a Chapter 11 petition in the Southern District of New York, the APA and the other two unions reached tentative agreements with American late on that Monday afternoon. All three unions then began the process of ratification under their respective constitutions and bylaws. As detailed below, the

---

[1] The factual assertions contained herein are supported by the Declarations of Sam Bertling and Keith Bounds which have been separately filed in this cause.

votes of APA's members are scheduled to be tabulated upon close of voting at 4 PM Central Time on Monday, April 14, 2003.

### B. The APA's Constitutional Provisions Governing this Ratification Process

Article II, Section 1.A of the APA's Constitution and Bylaws ("Constitution") provides that "[t]his Constitution and Bylaws shall be the supreme law of APA." Article II, Section 2.A provides that "[t]he governmental powers of the APA shall be vested in the Board of Directors and the officers in accordance with the laws provided herein. The final control of the APA shall be vested in the membership." Article XI, Section 1.A provides that the APA's President shall "enforce the Constitution and Bylaws."

The APA Constitution contains only two requirements for adoption of a proposed collective bargaining agreement: approval by the APA's Board of Directors, and then ratification by majority vote of the APA's members with 14 days permitted for the balloting. These requirements are set forth in Article XIII of the APA Constitution as follows:

> D. Basic collective bargaining agreements and agreements of affiliation or merger with other labor organizations shall be submitted to the Board of Directors for review. After reviewing the agreement, the Board of directors shall vote to approve or reject the agreement. Only agreements approved by the Board of Directors by a majority vote, both one-man, one-vote and roll call vote shall be forwarded to the affected membership for a ratification vote.

> E. The Board of Directors shall determine the date the ratification ballots will be distributed to all affected members in good standing. Active members in good standing may vote for or against ratification of the agreement and shall return their ballots postmarked not later than fourteen (14) days following the date of ballot distribution. In order to bind the Association, the agreement shall be ratified by a majority vote of the participating members. The membership shall be notified immediately of the results.

Article II, Section 1.B of the APA Constitution requires the Board of Directors to approve and follow a Policy Manual to govern the APA's affairs. At the same time, however, Section 1.B

expressly authorizes the Board to change or depart from the Policy Manual as follows:

> The Board of Directors does have the authority to alter the Policy Manual at any time or to deviate from the Policy Manual according to the following standards:
>
> 1. The Board may vote, by simple majority, to make a permanent change to the Policy Manual.
>
> 2. The Board may vote, by a two-thirds (2/3) majority, to take an action (or actions) that either explicitly or implicitly deviate(s) from the Policy Manual.
>
> At any time the Board takes either of the above actions, the membership will be informed within 24 hours using the APA Information Hotline. Such notice will describe the nature of the change or the deviation. Further, the specific substance of the change or deviation will be made electronically available within seven (7) days.

Exercising their authority under the APA Constitution, the APA's 18-member Board of Directors adopted a Resolution on March 26, 2003, entitled "Accelerated Ratification Procedures." That Resolution set forth the process by which the union membership would review and vote on any Board-approved Tentative Agreement emerging from the intensive bankruptcy avoidance negotiations then taking place between the APA and American Airlines.

Among other things, the Board's Resolution:

- provided for ratification by electronic voting under the auspices and supervision of the American Arbitration Association (the same system used in recent APA officer elections);

- established a voting schedule guaranteeing APA members 14 days in which to register their final vote, with close of voting at 4 PM Central Time on April 14, 2003;

- provided that the Tentative Agreement, together with an abbreviated explanation, would be posted electronically on the APA members' side of the APA website "as

---

soon as possible after the Board has voted to accept the proposed agreement for submission to the membership;" and

- provided that the procedures in the APA's Policy Manual that would otherwise govern contract ratification "shall be temporarily suspended and replaced by" the procedures of the Resolution "for the purpose of voting on this particular Tentative Agreement."

The APA Board approved this Resolution by a vote of 15-1, with two Board members abstaining. Thus, to the extent that the Resolution provided for deviation from the Policy Manual, it received more than the 2/3 majority vote prescribed by Article II, Section 1.B.[2]

## C. The APA's Conduct of this Ongoing Ratification Vote

On the afternoon of March 31, 2003, the APA Board of Directors reviewed and approved by majority vote (both one-man, one-vote and roll call vote) the terms of a Tentative Agreement with American. In accordance with the Constitution and the Resolution, the Board authorized the submission of this proposed agreement to ratification by the APA's members. Within hours of the Board's approval, the APA posted a summary of the proposed agreement on the APA website. Concurrently, the APA's Negotiating Committee and legal counsel worked steadily with American's representatives to develop specific, mutually agreeable language codifying the terms of the proposed agreement as amendments to the Green Book. Specific language was posted as it became available, on an ongoing basis. The APA's website notified all members that proposed contract language was subject to ongoing revisions and that postings would be updated as necessary.

---

[2] In accordance with Article II, Section 1.B, the APA's membership was promptly notified of this Resolution through the Information Hotline, and the Resolution itself was

Immediately following approval of the Tentative Agreement, the APA began scheduling mass membership meetings (also referred to as "Road Shows"), at all of the APA's designated domiciles, for the purpose of answering questions about, and facilitating discussion of, the proposed agreement. Specifically, membership meetings were held on April 3 at Dallas Fort Worth; April 4 at Los Angeles and Chicago; April 5 at San Francisco and Miami; April 7 at Miami and Washington; April 8 at Chicago and Boston; April 9 at Saint Louis and New York; and April 10 at Dallas Fort Worth. These Road Shows began with a four to five hour presentation of the terms of the prepared agreement followed by a lengthy question and answer period.

Throughout the negotiation process, and continuing during the 14-day ratification period, APA members regularly communicated and shared their views on the APA's website and open members' forum. Moreover, both prior to and after March 31, APA members established their own websites in order to disseminate their views and promote widespread discussion regarding the pros and cons of the bankruptcy-avoidance agreement with American. See, e.g., http://www.apapdp.org. Among the prominent critics were current and former members of the APA's Board of Directors.

Under the ratification procedures established by the Resolution, every eligible APA member has been issued his or her own secret voting password. Any eligible voter may vote or refrain from voting, in complete secrecy. Voters may freely change or rescind their vote at any time until the scheduled close of balloting at 4 PM Central Time on April 14, 2003.

---

promptly posted on the APA members' website.

---

## APPLICABLE LEGAL STANDARDS

### A. The Prerequisites for a Temporary Restraining Order

Under Fed. R. Civ. P. 65, the "extraordinary equitable remedy" of a temporary restraining order or a preliminary injunction may be granted "only if plaintiff establishes four elements: (1) a substantial likelihood of success on the merits, (2) a substantial threat that plaintiff will suffer irreparable injury if the [TRO or injunction] is denied, (3) that the threatened injury outweighs any damage that the injunction might cause defendants, and (4) that the [TRO or injunction] will not disserve the public interest." Sugar Busters LLC v. Brennan, 177 F.3d 258, 265 (5th Cir. 1999), citing Hoover v. Morales, 164 F.3d 221, 224 (5th Cir. 1998). See Canal Authority of Florida v. Callaway, 489 F.2d 567, 572 (5th Cir. 1974). The party seeking such extraordinary relief bears the "cumulative burden of proving each of the four elements before a temporary restraining order or preliminary injunction can be granted." Clark v. Pritchard, 812 F.2d 991, 993 (5th Cir. 1987); Mississippi Power & Light Co. v. United Gas Pipe Line Co., 760 F.2d 618, 621 (5th Cir. 1985) (the "extraordinary remedy" is available only "if the movant has clearly carried the burden of persuasion" on all four elements). Thus, "failure of a movant to establish one of the above four elements will result in the denial of a motion for a temporary injunction." Medlin v. Palmer, 874 F.2d 1085, 1091 (5th Cir. 1989).

### B. The Law Governing APA's Internal Union Ratification Vote

Federal law does not require unions to submit their collective bargaining agreements to a membership vote, nor does the law mandate any other mechanism for approval of union contracts. Rather, any asserted right of union members to a contract ratification vote depends exclusively on the union's own constitution and bylaws. O'Neill v. Air Line Pilots Ass'n, 886 F.2d 1438, 1447-48 (5th Cir. 1989), rev'd on other grounds, 499 U.S. 65 (1991); Alexander v.

Int'l Union of Operating Engrs., 624 F.2d 1235, 1240 (5th Cir. 1980); Local No. 243 v. United Transportation Union, 1993 U.S. Dist. LEXIS 20714, **11-12 (No. 4:90-CV-541-A, N.D. Tex. May 6, 1993), aff'd without opinion, 18 F.3d 937 (5th Cir. 1994).

Although Section 101(a)(1) of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(1), protects a union member's "equal rights and privileges within such organization . . . to vote in elections or referendums of the labor organization," the Supreme Court has made it clear that this provision is *no more than a command that members and classes of members shall not be discriminated against* in their right to nominate and vote." Fernandez-Montes v. Allied Pilots Ass'n, 987 F.2d 278, 288-89 (5th Cir. 1993) (emphasis added), citing Calhoon v. Harvey, 379 U.S. 134, 139 (1964), and Ackley v. Western Conf. of Teamsters, 958 F.2d 1463, 1473 (9th Cir. 1992) (Section 101(a)(1) "is an anti-discrimination provision, pure and simple"). See Local 243 v. UTU, 1993 U.S. Dist. LEXIS at *11 ("This provision does not create rights, but rather assures that when a union grants rights to its members all will be treated equally.").

Accordingly, the federal courts cannot entertain LMRDA Section 101(a)(1) claims challenging contract ratification processes absent discrimination against particular union members or classes of members. See Sim v. New York Mailers' Union No. 6, 166 F.3d 465, 471 (2d Cir. 1999) (though complaint was "chock full of alleged misconduct by Union officials," court lacked subject matter jurisdiction absent allegation of discrimination in voting); Members for a Better Union v. Bevona, 152 F.3d 58, 67 (2d Cir. 1998) (same, despite allegations that timing of ratification voting dissuaded members from voting and that union officials unfairly "tainted" the vote); Fulk v. United Transportation Union, 81 F.3d 733, 735-36 (7th Cir. 1996) (same, even assuming that voting procedure violated union's constitution); Alexander v.

---

Operating Engrs., 622 F.2d at 1240 ("Plaintiffs have not stated a cause of action" where alleged

denial of right to vote "affected each member equally"); Local 243 v. UTU, 1993 U.S. Dist.

LEXIS at **11-12 (summary judgment against plaintiffs was required where they "have not

shown that there were denied any right granted to any other union member"). For that same

reason, the prevailing and most well reasoned authority rejects any attempt to imply from Section

101(a)(1) a freestanding statutory right to a well-informed or "meaningful" internal union vote.

See Ackley v. Western Conf., 958 F.2d at 1473 n.7.[3]

Finally, whether evaluating claims under the LMRDA or under a union's own

constitution, the federal courts "strive to avoid interference with internal union affairs." Newell

v. Int'l Bhd. of Elec. Workers, 789 F.2d 186, 1189 (5th Cir. 1986), citing Wirtz v. Glass bottle

Blowers Ass'n, 389 U.S. 463, 470-71 (1968), and Calhoon v. Harvey, 379 U.S. 134, 140 (1964).

In particular, a union's interpretation and application of its own constitution is given deference,

and will not be overturned, unless it is "patently unreasonable." O'Neill v. ALPA, 939 F.2d at

1206-07; Newell v. IBEW, 789 F.2d at 1189. Accord: Spellacy v. Airline Pilots Ass'n, 156 F.3d

120, 126-27 (2d Cir. 1998) (judicial review of internal union decision making is "highly

deferential"); Teamsters Joint Council 42 v. Int'l Bhd. of Teamsters, 82 F.3d 303, 306 (9th Cir.

---

[3] In Christopher v. Safeway Stores, 644 F.2d 467 (5th Cir. 1981), a case decided shortly
after Alexander v. Operating Engrs., the Fifth Circuit applied Section 101(a)(1) in an anomalous
manner that conflicted with Alexander and with the Supreme Court's unequivocal directive in
Calhoon v. Harvey that Section 101(a)(1) prohibits only discrimination in membership rights.
Christopher has been rightly criticized as "squarely at odds not only with the holding of the
Supreme Court in Calhoon, with prior Fifth Circuit precedent, and with the Seventh and Tenth
Circuit law, but also with the plain language of the statute." Ackley v. Western Conf., 958 F.2d
at 473 ("We decline to give Section 101(a)(1) an interpretation that its language is incapable of
sustaining"). See Fulk v. UTU, 81 F.3d at 736. Notably, the Fifth Circuit's most recent
discussion of LMRDA Section 101(a) explicitly embraces Calhoon and Ackley, and implicitly
rejects Christopher's discredited reading of the statute. Fernandez-Montes v. Allied Pilots Ass'n,
987 F.2d at 288-89. This Court has done likewise. See Local 243 v. UTU, 1993 U.S. Dist.

---

1996) (noting the "well established federal policy of avoiding unnecessary interference in the internal affairs of unions," finding that "bad faith" is a "high standard" satisfied only by evidence that the union leadership acted out of self-interest, contrary to the union's best interest, or in an unconscionable manner); Dow v. United Bhd. of Carpenters, 1 F.3d 56, 58 (1st Cir. 1993) (absent bad faith, "a labor organization's interpretation of internal union documents puts an end to judicial scrutiny so long as the interpretation is 'facially sufficient' or grounded in 'arguable authority'") (citations omitted); Stelling v. Int'l Bhd. of Elec. Workers, Local 1547, 587 F.2d 1379, 1389 n.10 (9th Cir. 1978) (the question for the court is "whether there was arguable authority for the officer's act from the officer's viewpoint at the time").

## ARGUMENT

### PLAINTIFFS' APPLICATION MUST BE DENIED BECAUSE THEY HAVE FAILED TO SATISFY THE REQUIREMENTS FOR A TRO IN THIS CASE

A. Plaintiffs Fail to Demonstrate a Substantial Likelihood of Success on the Merits

Though the Plaintiffs purport to bring this action under the LMRDA, their Complaint does not identify a single statutory provision that was allegedly violated in this case.[4]  For that reason alone, the Plaintiffs do not satisfy the requirement of a substantial likelihood of success on the merits.

Moreover, even if the Plaintiffs had meant to claim violation of the LMRDA's "equal rights" provision, Section 101(a)(1), their Complaint and accompanying papers nonetheless fail

---

LEXIS at **11-12 (ignoring Christopher, following Alexander and Ackley).

[4]  To the extent that they repeatedly cite and rely upon the Labor Management Relations Act, see Complaint at ¶ I and Count III, it does not apply to APA.  29 U.S.C.§ 152(2)-(3), § 185.

---

to state a claim.   As shown above, and as the Fifth Circuit has emphasized, Section 101(a)(1) is

"*no more than a command that members and classes of members shall not be discriminated*

*against* in their right to nominate and vote." Fernandez-Montes v. APA, 987 F.2d at 288-89

(emphasis added), citing Calhoon v. Harvey, 379 U.S. at 139.  The Plaintiffs here do not allege

that the APA singled them out for discriminatory treatment or denied them voting rights afforded

to other APA members.  Rather, they complain of a ratification process that applies in the same

manner to all APA members, without distinction.  As the courts have recognized, a claim under

Section 101(a)(1) requires an allegation and a showing of discrimination in membership rights.

Alexander v. Operating Engrs., 622 F.2d at 1240 ("Plaintiffs have not stated a cause of action"

where alleged denial of right to vote "affected each member equally").  Accord: Sim v. New York

Mailers' Union, 166 F.3d at 471; Members v. Bevona, 152 F.3d at 67; Fulk v. UTU, 81 F.3d at

735-36; Ackley v. Western Conf., 958 F.2d at 1473 and n.7; Local 243 v. UTU, 1993 U.S. Dist.

LEXIS at **11-12.[5]  Accordingly, the Plaintiffs cannot demonstrate a substantial likelihood of

success on the merits.

As for their claim under the APA Constitution, the Plaintiffs complain primarily that the

APA failed to conduct this ratification vote in accordance with the Policy Manual.  That

argument fails on its face, however, for it is undisputed that Article II, Section 1.B of the APA

Constitution expressly authorizes the APA's Board to depart from any and all provisions in the

---

[5] The cases cited by the Plaintiffs in support of their LMRDA claim are not the law in this
Circuit.  In any event, the circumstances of this case are clearly distinguishable.  Among other
distinguishing facts, this case involves extensive and well-publicized collective bargaining
negotiations; a well-informed membership in continual, and virtually instantaneous, electronic
communication with each other and their union; a vigorous and sustained exchange of views on
the pros and cons of negotiating pre-bankruptcy concessions versus litigating in Chapter 11
proceedings; and continual, good-faith efforts by the union, in the face of exigent circumstances,
to disseminate as much information as possible to the entire union membership, as soon as it

Policy Manual by a two-thirds majority vote, and that more than two-thirds of the Board

approved such a deviation in this case.

Without the Policy Manual, the Plaintiffs are left to argue that the Board, facing

extraordinary circumstances, violated Section XIII of the APA Constitution by approving and

submitting to membership the substance of the proposed bankruptcy-avoidance agreement before

finalizing all of its language.   Article XIII, however, does not specify that an "agreement" must

take any particular form in order to be approved and ratified.[6]   In approving the March 31

agreement for submission to ratification, and scheduling an April 14 vote count to meet

American's bankruptcy deadline, the APA Board acted in good faith based on an interpretation of

the Constitution that was clearly reasonable under the circumstances, particularly when viewed

from the Board members' perspective at that time.   The Plaintiffs have presented no evidence to

the contrary; indeed, their Complaint does not allege bad faith, self-dealing, or unconscionable

conduct on the part of the Board.   Accordingly, as demonstrated at pp. 9-10, above, well settled

law requires judicial deference to the Board's interpretation and application of the APA

Constitution.   Here, again, the Plaintiffs have not met their burden of proving a substantial

likelihood of success on the merits.

---

becomes available.

[6] Indeed, one of the bedrock principles of federal labor law is that collective bargaining agreements are binding once agreed to orally; the law imposes on the employer a duty to reduce the agreement to writing on request of the union. 29 U.S.C. §158(a)(5). E.g., Graphic Communications Local 554 (World Color Press), 306 NLRB 844, 140 LRRM 1255 (1992), enforced, 991 F.2d 1302, 143 LRRM 2131 (7th Cir. 1993); Hydrologics, Inc., 293 NLRB 1060, 131 LRRM 1350 (1989) (refusal to execute supplemental wage agreement after conclusion of reopener negotiations); Pacific Coast Metal Trades Dist. Council (Lockheed Shipbuilding Co.), 282 NLRB 239, 125 LRRM 1124 (1986).

---

## B. Plaintiffs Fail to Demonstrate Irreparable Injury

As indicated above, a persuasive showing of "irreparable injury" is a sine qua non for

extraordinary injunctive relief. See DFW Metro Line Services v. Southwestern Bell Tel Co., 901

F.2d 1267, 1269 (5th Cir. 1990). In this case, the Plaintiffs have not even alleged, much less

demonstrated, a clear likelihood of irreparable injury should the APA members' votes be counted

as scheduled on April 14.

The Plaintiffs define their asserted injury as "the inability to adequately review the terms

of the Tentative Agreement before voting on it, and the resulting passage or failure of an

agreement whose terms were not even known at the time of the vote."[7] But that purported injury

is in no sense *irreparable*, for if the Plaintiffs were ultimately to prevail on the merits of their

challenge to the contract ratification process, this Court could conceivably set aside the results of

the balloting and order a re-run vote.[8] Indeed, such after-the-fact re-run orders are a common

judicial remedy for allegedly defective elections and referenda of all kinds, particularly in the

labor relations arena.[9]

---

[7] Plaintiffs' Verified Application for a Temporary Restraining Order ("Pl. App.), ¶ 17.

[8] While American may, in such event, still take the position that the Tenative Agreement has not been ratified and then file for bankruptcy, it is certain, from what American has advised APA that if the vote count is enjoined and delayed past April 15th, American will immediately file for bankruptcy and the Tenative Agreemnt will be off the table and replaced by American's 11 U.S.C. Sec.1113 proposal. (See page 15-16, infra.).

[9] For example, in elections of union officers under Title IV of the LMRDA, 29 U.S.C. § 481, the statutory remedy for election misconduct or improper procedures is a supervised re-run election. See Calhoon v. Harvey, 379 U.S. 134 (1964). Similarly, the standard remedy for defective representation elections under the National Labor Relations Act, 29 U.S.C. § 151 et seq., and the Railway Labor Act, 45 U.S.C. §§151-188, is an order setting aside the invalid election and conducting a re-run vote. In fact, the Plaintiffs themselves argue that conducting "a second lawful referendum" would be feasible in this case. Brief in Support of Plaintiffs' Motion For a Preliminary Injunction ("Pl. Brief") at 13.

---

DEFENDANT'S OPPOSITION TO APPLICATION FOR TEMPORARY RESTRAINING ORDER        Page 13

It is clear, then, that the mere tabulation and announcement of the results of an allegedly improper vote will not qualify as irreparable harm. See Siegel v. LePore, 234 F.3d 1163, 1177 (11th Cir. 2000) (upholding district court's refusal to enjoin a disputed recount: "[W]e reject the contention that merely counting ballots gives rise to cognizable injury"). This is so even in political contexts where voting irregularities or defective processes rise to the level of Constitutional violations. Id., citing Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville, 896 F.2d 1283, 1285 (11th Cir. 1990) (finding "no authority" for the proposition that "the irreparable injury needed for a preliminary injunction can properly be presumed from a substantially likely equal protection violation"). Thus, the Plaintiffs add nothing to their case by arguing that counting the votes on April 14 will "irreparably alter[]" the "political landscape" within the APA.[10] Siegel v. LePore, 234 F.3d at 1177 (rejecting argument that a post-election remedy could not "repair the damage to the legitimacy of the Bush Presidency caused by 'broadcasting' the flawed results of a recount that put vice President Gore ahead").

Equally unavailing is the Plaintiffs' vague and generic assertion that "thousands of pilots and their families will be severely affected," in unspecified ways, if the contract ratification votes are counted.[11] Those conclusory allegations, whether in briefs or sworn affidavits, do not suffice to establish irreparable harm. See Consolidated Restaurant Operations, Inc. v. Nat'l Processing Co., LLC, 2002 U.S. Dist. LEXIS 11795 (No. 3:02-CV-1278-G, N.D. Tex. June 28, 2002) (allegations of irreparable harm that were "conclusory in nature" could not justify a TRO), citing Hunt v. Bankers Trust Co., 646 F.Supp, 59, 63 (N.D. Tex. 1986) (conjecture in affidavit concerning irreparable injury is insufficient).

---

[10] Pl. Brief at 12.

[11] Pl. Brief at 12.

---

In any event, the immediate result of a vote count on April 14 would be a report to American Airlines that the APA has accepted or rejected the proposed bankruptcy-avoidance contract, subject to the legal challenges raised in this action. And the consequences of such acceptance or rejection for American's pilots would be economic in nature. Because economic losses and other injuries compensable by money damages cannot qualify as "irreparable" harm, the Plaintiff's application for a TRO must be denied. DFW Metro Line v. Southwestern Bell, 901 F.2d at 1269 (plaintiff failed to show irreparable injury because any potential harm "could be calculated and recompensed in the form of damages") (citing authorities).

C. Any Threatened Injury to Plaintffs is Outweighed by the Harm Flowing From a TRO

While the Plaintiffs allege only vague and speculative injury from the ongoing ratification vote, the harm flowing from issuance of a TRO in this case is concrete and direct, by contrast, and it would far outweigh the impact of denying the Plaintiffs' application.

Specifically, a TRO blocking or delaying the April 14 vote count in this case will irrevocably prevent the APA from ratifying a collective bargaining agreement by April 15. Since American Airlines has announced that it will proceed with its Chapter 11 petition unless all three unions representing its workforce have ratified their contracts by April 15, a TRO in this case will *automatically* doom all of the American employees' efforts to avoid bankruptcy.

Moreover, the magnitude of the harm flowing from a bankruptcy filing plainly dwarfs the injuries claimed by the Plaintiffs. Once the Company enters Chapter 11 proceedings, control of the airline operations and the employees' future is no longer in their hands for resolution of disputes based on mutual interest. Rather, control will shift to a host of third-party creditors, bankers and investors, under the supervision of a New York bankruptcy judge, who may use their power to veto or gut collective bargaining agreements. The Chapter 11 administrative process

---

itself will siphon hundreds of thousands, if not millions, in assets from American's estate, money that could otherwise have gone toward negotiated wages and benefits.  As a result, the dollar amount of concessions from all employees required for the Company's survival will increase dramatically.  Indeed, American has informed that, in the event it enters bankruptcy, the number of pilot furloughs alone will be substantially higher than under the proposed agreement.

Furthermore, and perhaps most significantly, the pilots represented by APA would themselves suffer irreparable harm if the vote count was enjoined because they would be forever deprived of their opportunity to vote on the Tentative Agreement.  If the Tentative Agreement is not ratified by April 15, American will file for bankruptcy protection and will then propose, and if not agreed to by APA, seek to impose under 11 U.S.C. 1113(c) and (e), contract concessions greater than that embodied in the Tentative Agreement.  Plaintiffs's allegation at page 13 of their brief in support of the TRO that APA could wait to count the votes or hold second referendum is disingenuous, as they know quite well that once American files for bankruptcy protection the Tentative Agreement will be off the table and will no longer be an option for American pilots to choose to vote on.  APA and the pilots it represents will then be dealing with a new contract proposal from American and applications before the Bankruptcy Court for interim contract modifications and/or contract rejection under Section 1113(e) and (c) of the Bankruptcy Code.[12]

---

[12] Moreover, under 11 U.S.C. 1113 a shorter time-frame for action on APA's  acceptance of American's contract proposal even than that complained of by the Plaintiffs' here will be imposed by statute, with the hearing on American's application to reject on only ten(10) days notice and no later than fourteen days (14) days after the filing of the application to reject.  11 U.S.C. Section 1113(d)(1).

### D. <u>Granting a TRO in this Case Would Disserve the Public Interest</u>

The Railway Labor Act, the statute governing the APA's relationship with American,

embodies a clear public policy of fostering labor-management cooperation and systemwide

collective bargaining to establish terms and conditions of employment in the airline industry.

<u>E.g., Chicago and North Western Ry. v United Transportation Company,</u> 402 U.S. 570 (1971)

and <u>Virginia Ry. Co. v System Federation No. 40,</u> 300 U.S. 515 (1937). The RLA establishes a

unique set of bargaining and dispute resolution procedures, under the auspices of the National

Mediation Board, but does not prescribe any conditions or standards for union ratification or

approval of contracts once labor-management consensus is reached. Last-minute judicial

intervention in the conclusion of collective bargaining agreements between American and its

unions is plainly contrary to this longstanding framework and well-established public policy.

Additionally, we submit that there is no arguable public interest in blocking the

employees' chance to avoid Chapter 11 proceedings, and triggering another airline bankruptcy.

The airline industry faces a major crisis, and the stakes are high for all those affected, which

includes not only the parties but also the public. A bankruptcy filing by American Airlines will

have a devastating effect on the local and national economy, and further disrupt the already

crippled national air transportation system. Allowing the ongoing ratification process to reach its

scheduled conclusion on April 14 will ensure that the pilots at least have a voice and a role in

deciding their immediate future, whatever the outcome of the vote. Denying the pilots that

opportunity, and sabotaging in the process the contract ratification efforts of other employee

groups at American, simply does not serve the public interest.

## CONCLUSION

For all the reasons set forth above, this Court should deny the Plaintiffs' application for a

TRO and permit the ongoing contract ratification vote and vote count to proceed as scheduled.

Respectfully Submitted,

EDGAR N. JAMES*
D.C. Bar No. 333013
James & Hoffman, P.C.
1101 17th Street, N.W., Suite 510
Washington, D.C. 20036
(202) 496-0500
(202) 496-0555 FAX

SANFORD R. DENISON
Texas Bar No. 05655560
Baab & Denison, LLP
Stemmons Place, Suite 1100
2777 N. Stemmons Freeway
Dallas, TX 75207
(214) 637-0750
(214) 637-0730 FAX

* Application for Admission Pro Hac
  Vice to be filed or currently pending

DATED: April 14, 2003

COUNSEL FOR DEFENDANT
ALLIED PILOTS ASSOCIATION

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been served this 14ᵗʰ day of April, 2003, by the means specified below, addressed to the following:

David H. Bodian                  (Via certified mail r.r.r.)
Bodian & Bodian, L.L.P.
425 Broad Hollow Road
Melville, New York 11747

Eugene Zemp DuBose               (Via Hand Delivery)
3303 Lee Parkway
Dallas, Texas 75219

Dee J. Kelly                     (Via Hand Delivery)
Roger Diseker
Kelly, Hart & Hallman, P.C.
201 Main Street, Suite 2500
Forth Worth, Texas  76102




                              Sanford R. Denison