ORIGINAL

| | |
|---|---|
| DANIEL CAREY, ROBERT HELD, and LLOYD HILL ) ) ) ) ) ) Plaintiffs, ) ) ) ) ) ALLIED PILOTS ASSOCIATION, ) 14600 Trinity Boulevard ) Suite 500 ) Fort Worth, Texas 76155 ) ) Defendant ) ) | Cause No. _____ 4-03CV-277-Y |

## DECLARATION OF KEITH BOUNDS

STATE OF TEXAS §
§
COUNTY OF TARRANT §

1. My name is Keith Bounds. I am an American Airlines Captain based in St. Louis and serve as the St. Louis Domicile Chairman for the Allied Pilots Association ("APA"). In my capacity as domicile chairman I concurrently serve as a member of the APA Board of Directors ("BOD"). I was present at the APA BOD meeting that lead to the APA BOD ratification of the Tentative Agreement.

2. As domicile chairman and as a member of the BOD, I am familiar with and have knowledge of the operation of the collective bargaining agreement between the APA and American Airlines, Inc. ("American"), which is referred to as the "Green Book." I am also familiar with and have knowledge of the operation of the governing documents of APA which are comprised of its "Constitution and Bylaws" ("Constitution") and "Policy Manual."

### A. The Background and Context of the Ongoing Contract Ratification

3. The APA is the collective bargaining representative of the approximately 12,000 pilots employed by American Airlines ("American" or "the Company").

4. The APA's last collective bargaining agreement with American (referred to as the "Green Book"), became amendable, in August 2001, and the parties have been negotiating for a renewed agreement ever since that date.

5. Concurrently, in the aftermath of the September 11, 2001 terrorist attacks and throughout the period leading up to the present war in Iraq, American and other major air carriers have suffered severe, and increasing, financial losses. Two of those major carriers, U.S. Airways and United Airlines, recently filed for bankruptcy and, in the process, obtained dramatically modified collective bargaining agreements and millions of dollars in economic concessions from the unions representing their pilots and other employees.

6. As early as February of this year, American approached the APA and the two other unions representing American's employees seeking contractual concessions in the form of substantial cost reductions from all three employee groups in a last-ditch effort to avoid a Chapter 11 bankruptcy filing.

7. On or about February 24, 2003, Don Carty, America's CEO, made an appearance before the APA BOD where he advised us that the deadline for reaching agreement with all three unions was Monday, March 31, with an April 14 deadline for completing ratification by each union's members. He advised that for various business reasons American had firmly decided that it would file for bankruptcy protection immediately if a Tentative Agreement was not reached by March 31st and ratified no later than April 14th.

8. After extensive, around-the-clock negotiations against the March 31 deadline, and with American's lawyers poised to file a Chapter 11 petition in the Southern District of New York, the APA and the other two unions reached tentative agreements with American late on that Monday afternoon.

9. All three unions then began the process of ratification under their respective constitutions and bylaws.

10. The votes of APA's members are scheduled to be tabulated upon close of voting at 4 PM Central Time on Monday, April 14, 2003. Copies of the electronic ballot and voting instructions were mailed to all APA members on March 31, 2003 and are attached hereto and incorporate herein as Exhibit 1.

B. The APA's Constitutional Provisions Governing this Ratification Process

11. Article II, Section 1.A of the APA's Constitution and Bylaws ("Constitution") provides that "[t]his Constitution and Bylaws shall be the supreme law of APA." Article II, Section 2.A provides that "[t]he governmental powers of the APA shall be vested in the Board of Directors and the officers in accordance with the laws provided herein. The final control of the APA shall be vested in the membership." Article XI, Section 1.A provides that the APA's President shall "enforce the Constitution and Bylaws."

12. The APA Constitution contains only two requirements for adoption of a proposed collective bargaining agreement: approval by the APA's Board of Directors, and then ratification by majority vote of the APA's members with 14 days permitted for the balloting. These requirements are set forth in Article XIII of the APA Constitution as follows:

> D. Basic collective bargaining agreements and agreements of affiliation or merger with other labor organizations shall be submitted to the Board of Directors for review. After reviewing the agreement, the Board of directors shall vote to approve or reject the agreement. Only agreements approved by the Board of Directors by a majority vote, both one-man,

one-vote and roll call vote shall be forwarded to the affected membership for a ratification vote.

E.  The Board of Directors shall determine the date the ratification ballots will be distributed to all affected members in good standing. Active members in good standing may vote for or against ratification of the agreement and shall return their ballots postmarked not later than fourteen (14) days following the date of ballot distribution. In order to bind the Association, the agreement shall be ratified by a majority vote of the participating members. The membership shall be notified immediately of the results.

13.  Article II, Section 1.B of the APA Constitution requires the Board of Directors to approve and follow a Policy Manual to govern the APA's affairs. At the same time, however, Section 1.B expressly authorizes the Board to change or depart from the Policy Manual as follows:

> The Board of Directors does have the authority to alter the Policy Manual at any time or to deviate from the Policy Manual according to the following standards:
>
> 1.  The Board may vote, by simple majority, to make a permanent change to the Policy Manual.
>
> 2.  The Board may vote, by a two-thirds (2/3) majority, to take an action (or actions) that either explicitly or implicitly deviate(s) from the Policy Manual.
>
> At any time the Board takes either of the above actions, the membership will be informed within 24 hours using the APA Information Hotline. Such notice will describe the nature of the change or the deviation. Further, the specific substance of the change or deviation will be made electronically available within seven (7) days.

14.  Exercising their authority under the APA Constitution, the APA's 18-member Board of Directors adopted a Resolution on March 26, 2003, entitled "Accelerated Ratification Procedures." That Resolution set forth the process by which the union membership would review and vote on any Board-approved Tentative Agreement emerging from the intensive bankruptcy avoidance negotiations then taking place between the APA and American Airlines. A

copy of that resolution is attached hereto and incorporated herein as Exhibit 2.

15. Among other things, the Board's March 26, 2003 Resolution:

- provided for ratification by electronic voting under the auspices and supervision of the American Arbitration Association (the same system used in recent APA officer elections);

- established a voting schedule guaranteeing APA members 14 days in which to register their final vote, with close of voting at 4 PM Central Daylight Time on April 14, 2003;

- provided that the Tentative Agreement, together with an abbreviated explanation, would be posted electronically on the APA members' side of the APA website "as soon as possible after the Board has voted to accept the proposed agreement for submission to the membership;" and

- provided that the procedures in the APA's Policy Manual that would otherwise govern contract ratification "shall be temporarily suspended and replaced by" the procedures of the Resolution "for the purpose of voting on this particular Tentative Agreement."

16. The March 26, 2003 Accelerated Ratification Procedures Resolution contemplated that there would be areas of agreement between American and APA that would not be in final contract language prior to Board approval or membership ratification of the agreement.

17. The APA Board approved the March 26, 2003 Resolution by a vote of 15-1, with two Board members abstaining. Thus, to the extent that the Resolution provided for deviation from the Policy Manual, it received more than the 2/3 majority vote prescribed by Article II, Section 1.B.

18. In accordance with Article II, Section 1.B, the APA's membership was promptly notified of the March 26, 2003 Resolution through the Information Hotline, and the Resolution itself was promptly posted on the APA members' website.

19. The BOD convened a Special Meeting nine days prior to March 31st and remained in session continuously through April 1st. During that time the BOD reviewed and was made aware of contractual language as it became available. For example, work rule changes, such as Reserve Rules and IOE (Initial Operating Experience), were agreed to early in the process, including applicable language, subject only to reaching a complete agreement. During this time the BOD was kept informed by the Negotiating Committee of the progress of negotiations and was provided with hard copies of the relevant contract language as soon as it became available. As such, by March 31st substantially all the material pieces of the final Tentative Agreement had been resolved and/or reduced to contractual language. The only exceptions were the few issues which had been agreed to in the final hours of the negotiation. Those few last minute items were briefed to the Board on March 31st as they became finalized during the day. The Board was briefed with regard to all those last minute items of the agreement prior to the Board voting to accept the Tentative Agreement and forward it to the membership for a ratification vote.

### C. The APA's Conduct of this Ongoing Ratification Vote

20. On the afternoon of March 31, 2003, the APA Board of Directors reviewed and approved by majority vote (both one-man, one-vote and roll call vote) the terms of a Tentative Agreement with American. In accordance with the Constitution and the Resolution, the Board authorized the submission of this proposed agreement for ratification by the APA's members.

21. Within hours of the Board's approval on March 31st, the APA posted a summary of the proposed agreement on the APA website.

22. On March 31st, an email was sent to APA members advising them of the major details of the Tentative Agreement. A copy of that email is attached hereto and incorporated herein as Exhibit 3.

23. Concurrently, the APA's Negotiating Committee and legal counsel worked steadily with American's representatives to develop specific, mutually agreeable language codifying the terms of the proposed agreement as amendments to the Green Book.

24. Specific language was posted on APA's website as it became available, on an ongoing basis.

25. The APA's website notified all members that proposed contract language was subject to ongoing revisions and that postings would be updated as necessary.

26. Immediately following approval of the Tentative Agreement the APA began scheduling mass membership meetings (also referred to as "Road Shows"), at all of the APA's designated domiciles, for the purpose of answering questions about, and facilitating discussion of, the proposed agreement. By email to pilots on April 1, 2003, the President of APA advised pilots of the "Road Show" schedule. A copy of that email is attached hereto and incorporated herein as Exhibit 4.

27. Specifically, "Road Show" membership meetings were held on April 3 at Dallas Fort Worth; April 4 at Los Angeles and Chicago; April 5 at San Francisco and Miami; April 7 at Miami and Washington; April 8 at Chicago and Boston; April 9 at Saint Louis and New York; April 10 at Dallas Fort Worth.

28. Throughout the negotiation process, and continuing during the 14-day ratification period, APA members regularly communicated and shared their views on the APA's website and open members' forum. The entire APA Board was placed on paid union leave for the purpose of attending their domicile "Road Shows," conducting local domicile meetings, and otherwise

being made available to the membership to answer, or to obtain answers to, questions about the Tentative Agreement.

29. Moreover, both prior to and after March 31, APA members established their own websites in order to disseminate their views and promote widespread discussion regarding the pros and cons of the bankruptcy-avoidance agreement with American. E.g., http://www.apapdp.org.

30. Among the prominent critics were current and former members of the APA's Board of Directors.

31. Under the ratification procedures established by the Resolution, every eligible APA member has been issued his or her own secret voting password. Any eligible voter may vote or refrain from voting, in complete secrecy. Voters may freely change or rescind their vote at any time until the scheduled close of balloting at 4 PM Central Daylight Time on April 14, 2003.

32. I declare under penalty of perjury that the foregoing is true and correct. Executed on this _13th_ day of _April_, 2003.

_____
KEITH BOUNDS, DECLARANT

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing document has been served this 14th day of April, 2003, by the means specified below, addressed to the following:

| | |
|---|---|
| David H. Bodian<br>Bodian & Bodian, L.L.P.<br>425 Broad Hollow Road<br>Melville, New York 11747 | (Via certified mail r.r.r.) |
| Eugene Zemp DuBose<br>3303 Lee Parkway<br>Dallas, Texas 75219 | (Via Hand Delivery) |
| Dee J. Kelly<br>Roger Diseker<br>Kelly, Hart & Hallman, P.C.<br>201 Main Street, Suite 2500<br>Forth Worth, Texas 76102 | (Via Hand Delivery) |

_____
Sanford R. Denison