ORIGINAL



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| DANIEL CAREY, ET AL. | § | |
| | § | |
| VS. | § | CIVIL ACTION 4:03-CV-277-Y |
| | § | |
| ALLIED PILOTS ASSOCIATION, | § | |
| ET AL. | § | |

## ORDER DENYING PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER

Pending before the Court is the Application for Temporary Restraining Order ("TRO") of plaintiffs Daniel Carey, Robert Held and Lloyd Hill, filed today, April 14, 2003. Having carefully considered the application and responses, the Court concludes that it should be DENIED.

## I. RELEVANT BACKGROUND

The Allied Pilots Association ("the APA") is a "non-profit, unincorporated association that represents airline pilots in employment related matters." (Pls.' Compl. at 2.) The conduct of the directors and officers of the APA is governed by two documents: (1) the APA Constitution and Bylaws and (2) the APA Policy Manual. (Constitution and Bylaws at 11.) Under the Constitution and Bylaws, an APA negotiating committee is responsible for negotiating a proposed agreement with American Airlines, Inc. (Constitution and Bylaws at 29-30.) Once these two groups reach a proposed agreement, the negotiating committee submits the proposed agreement to the APA's

1

Board of Directors ("the Board"). (*Id.* at 30.) If the proposed agreement is approved by a majority vote of the Board, then the agreement is termed a tentative agreement and is to be submitted to the APA membership for a vote. (*Id.*)[1] According to the Policy Manual,

---

[1] Section 9.06, which contains specific procedures that are to be followed during negotiations, states:

> D. The National Officers, Board of Directors, and Negotiating Committee shall not allow the negotiations/mediation/super-mediation process to be conducted in haste. The Association will not alter its negotiating procedures because of pressure or the imposition of deadlines set by management or the National Mediation Board (NMB) or other sources. These commonly used tactics must not be allowed to influence the conduct of APA's bargaining because hastily constructed agreements and unwritten or incomplete agreements frequently contain deficiencies or errors or provisions that later prove to be contrary to the best interests of the union members involved.

(Policy Manual at 59.) In addition, Section 9.07, which contains "tentative agreement procedures" states:

> A. Upon conclusion of a Tentative Agreement and prior to its presentation to the Board of Directors, the following requirements shall be completed by the Negotiating Committee:
>
> 1. The Tentative Agreement, all related letters, and the implementation schedule shall be reduced to contractual language.
>
> 2. The Tentative Agreement, and the implementation schedule, in contractual language, with all changes clearly identified, shall be furnished to the Board of Directors at least seven (7) days prior to any meeting convened to consider the Tentative Agreement.
>
> . . . .
>
> 6. The approved explanation of the Tentative Agreement, as well as the complete text of the Tentative Agreement, Supplements, published letters, the proposed implementation schedule, and a comment letter from each member of the Board of Directors who wishes to send one shall be mailed to the membership before any "Road Show" presentation begins. The membership at each domicile shall have at least fourteen (14) days to study the written text of any Tentative Agreement, Supplements, published letters, the proposed implementation schedule, and a comment letter from each member of the Board of Directors who wishes to send one prior to the presentation of a "Road Show" at that domicile. . . .

(Policy at 60-61.)

the Board "shall have the authority to alter the Policy Manual at any time or to deviate from the Policy Manual according to the following standards:

> 1. The Board may vote, by simple majority, to make a permanent change to the Policy Manual.
>
> 2. The Board may vote, by a two-thirds (2/3) vote, to take an action (or actions) that either explicitly or implicitly deviate(s) from the Policy Manual, on an exceptional basis.

(Policy Manual at 2; see also Constitution and Bylaws at 11.)

"In February of this year, American Airlines ("American") approached the APA and the two other unions representing American's employees seeking substantial contractual concessions from all three employee groups in a last-ditch effort to avoid a Chapter 11 bankruptcy filing." (Def. APA's Opposition ("Def.'s Opp.") at 2.) "The Company's deadline for reaching agreement with all three unions was Monday, March 31, with an April 14 deadline for completing ratification by each union's members." (Id.) In late March 2003, the APA's negotiating committee reached a tentative proposed collective bargaining agreement ("tentative CBA") with American. Pursuant to the APA's Constitution and Bylaws and Policy Manual, the negotiating committee forwarded the proposed CBA to the Board for its approval.

On March 26, the Board adopted a resolution entitled "Accelerated Ratification Procedures." This resolution "set forth the process by which the union membership would review and vote on any Board-approved Tentative Agreement emerging from the intensive bankruptcy

avoidance negotiations then taking place between the APA and American Airlines." (Def.'s Opp. at 4.)

On March 31, the Board voted on and approved the tentative CBA. Accordingly, the Board, also on March 31, submitted the tentative agreement to a vote by the union membership. The "APA initiated the referendum by mailing ballots to the membership that would allow them to vote via phone or the internet with a deadline of April 14, 2003." (Pls.' Br. at 1.) The Board indicated that it would announce the results of the vote by 4:00 p.m. (CST) on April 15. (*Id.*) At the time the Board distributed the ballots to the union membership, the contractual language of the tentative agreement was allegedly unavailable in any form. Subsequently, portions of the agreement have been posted on the APA website and made available in other forms. However, the language and terms used in different sections of the agreement have changed over the course of the two-week voting period. In addition, APA officials have allegedly "expressed confusion as to the actual content of the tentative agreement and freely admitted that they had violated the [Constitution and Bylaws] and the Policy [M]anual during the ratification process." (Pls.' Br. at 3.)

The plaintiffs claim that the Court should enter a TRO preventing the APA from terminating the membership voting on the tentative agreement at 4:00 p.m. on April 14, 2003, because the APA did not follow the rules and procedures set forth in the Constitution and Bylaws and the Policy Manual, which is a violation of the Labor Management Relations and Disclosure Act, 29 U.S.C. § 401 *et seq.*,

4

and the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185. Specifically, the plaintiffs claim that: (1) the negotiating committee failed to provide the Board a full and complete copy of the proposed tentative agreement at least seven days prior to any meeting to ratify or reject it in accordance with section 9.07 of the Policy Manual; and (2) the Board failed to provide a complete copy of the tentative agreement to the general membership of the APA at least 14 days prior to a vote in violation of section 9.07 of the Policy Manual. The plaintiffs claim that if these violations are permitted then the membership of the union will have been deprived an opportunity to cast a meaningful and informed vote.

## II. ANALYSIS

Under well settled Fifth Circuit precedent, a TRO is an extraordinary remedy that should not be granted unless the movant proves the same elements required generally for injunctive relief: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury to the movant outweighs any harm to the nonmovant that may result from the injunction; and (4) that the injunction will not undermine the public interest. *See Sugar Busters LLC v. Brennan*, 177 F.3d 258, 265 (5th Cir. 1999); *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998); *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990); *Canal Auth. of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974). The grant of interim injunctive

relief is "an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Direx Israel, Ltd. v. Breakthrough Medical Corp.*, 952 F.2d 802, 811 (4th Cir. 1992) (citing *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989).

With respect to the first element, the plaintiffs have failed to prove a substantial likelihood of success on the merits. The plaintiffs claim that the APA has violated the LMRDA, the LMRA, and certain provision of the Constitution and Bylaws and the Policy Manual. With respect to the LMRDA and the LMRA, the Court is not persuaded that it would rule in the plaintiff's favor after reviewing the plaintiffs' arguments and applicable caselaw. Furthermore, the plaintiffs have failed to show that the APA violated the Constitution and Bylaws or the Policy Manual because the evidence indicates that, pursuant to the amendment provisions of the Policy Manual itself, the Board voted to amend the terms of the ratification process contained in the Policy Manual.

As to the second element, the plaintiffs have also failed to demonstrate irreparable injury.[2] The plaintiffs define their asserted injury as "the inability to adequately review the terms of the Tentative Agreement before voting on it, and the resulting passage

---

[2] "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981).

6

or failure of an agreement whose terms were not even known at the time of the vote." (Pls.' Appl. at 7.) However, as noted by the APA, that purported injury is in no sense *irreparable*, for if the plaintiffs were ultimately to prevail on the merits of their challenge to the contract ratification process, this Court could conceivably set aside the results of the balloting and order a re-run vote. Furthermore, the injury to the plaintiffs if the voting is allowed to terminate on April 15 will be either that American will file bankruptcy or enter into a new CBA that will supposedly prevent American from having to file for bankruptcy. In either event, any consequences will be economic in nature. Because economic damages do not qualify as irreparable harm, the plaintiff's application for a TRO must be denied. *See DFW Metro Line v. Southwestern Bell*, 901 F.2d 1267, 1269 (5th Cir. 1990).

With respect to the third element, the plaintiffs have failed to show that the threatened injury to them outweighs the harm to the APA that may result from the injunction. A TRO blocking or delaying the April 14 vote count will irrevocably prevent the APA from ratifying a collective bargaining agreement by April 15. Since American Airlines, in sworn testimony as Intervenor in this case, has indicated that it will proceed with its Chapter 11 petition unless all three unions representing its workforce have ratified their contracts by April 15, a TRO in this case will *automatically* doom all of the American employees' efforts to avoid bankruptcy.

Finally, with respect to element four, granting a TRO in this

7

case would undermine the public interest. If the Court grants a TRO, then the APA will not ratify the CBA by the April 15 deadline. Consequently, American will file bankruptcy. A bankruptcy filing by American Airlines will have a devastating effect on the local and national economy and further disrupt the already crippled national air transportation system.

## III. CONCLUSION

The plaintiffs' Application for Temporary Restraining Order is DENIED.

SIGNED April 14, 2003.

TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

TRM/knv